JULIUS KING OPTICAL CO. v. BILHOEFER et al.

(Circuit Court, S. D. New York. July 22, 1903.)

1. PATENTS—INFRINGEMENT—EYEGLASS GUARDS.

The Wells patent, No. 412,442, for eyeglasses, relating to that part of the frame designed to hold the glasses on the nose of the wearer, which, as shown, consists of two or more pads on each side, one at least being above and to the rear of the others, such pads being attached to posts or standards secured to the lenses, the object being to hold the glasses steady in position, and prevent rocking or tipping, was not anticipated, and is valid. Claims 4 and 5 of such patent are also infringed by the lasso nose pieces or guards constructed in accordance with the Fox patent, No. 695,681, which, although varying in form, embody the same principle, and accomplish the same result in the same way, and by devices substantially the same.

In Equity. Suit for infringement of letters patent No. 412,442 for eyeglasses, granted to Walter S. Wells October 8, 1889. On final hearing.

The bill of complaint in this case was filed for the purpose of perpetually restraining and enjoining the defendants from making, constructing, using, vending, etc., any eyeglasses or eyeglass guards made like the so-called "lasso guards," or any other made in accordance with such invention and patent, and from practicing or causing to be put in practice, operation, or use the mode of construction described in said patent. The complainant, under its patent, manufactures, vends, etc., what is called the "anchor guard," under letters patent bearing date the 8th day of October, 1889, and numbered 412,442, being a patent for eyeglasses. Infringement is claimed through the manufacture and sale of what is known as the "lasso guard," which it is alleged came upon the market July or August, 1901. These letters patent were issued to one Walter S. Wells, and it is claimed that by due assignment they are now owned by the complainant. The defendants deny the assignment, and deny that Wells was the original and first inventor of the alleged improvement of eyeglasses set forth in the said patent, and deny that same were not in use, etc. The defendants deny infringement. The defendants allege that the said letters patent consists of devices, arrangements, and constructions, which were at the date of their supposed invention by Wells old and well known and familiar in form and operation in the art to which said letters patent relate, and deny novelty, and allege that said letters patent are void and destitute of patentable novelty. The defendants also allege that the lasso nose piece or guard complained of as constituting an infringement upon the said letters patent is manufactured and sold under the sanction and protection of letters patent granted to the manufacturer of said nose piece or guard, Ivan Fox, upon the 9th day of July, 1901, and March 18, 1902, Nos. 34,752 and 695,681, respectively. The defendants set out a large number of patents, and allege that prior to the making of the alleged invention set forth in the bill of complaint the alleged invention therein shown was patented and described in all things. Subsequent to January 2, 1902, and after the answer herein was filed, the defendant Bilhoefer transferred his interest in the firm to one Richard E. Stilwell, and the business is conducted at the same place under the style of McCoy & Stilwell. Stilwell has been made a party defendant.

H. Albertus West, for complainant.
William C. Strawbridge, for defendants.

RAY, District Judge (after stating the facts). Letters patent No. 412,442, dated October 8, 1889, issued to Walter S. Wells, of New York, N. Y., being a patent for a new and useful improvement in eye-

glasses, have been duly assigned, and are now owned by the complainant, as clearly appears from the evidence. The complainant alleges infringement of claims 4 and 5 of said letters patent, which read as follows:

"(4) In an eyeglass, the combination, with lenses, of posts or standards secured thereto, nose pads secured to said posts or standards and adapted to grip the nose, and other nose pads rigidly secured to said standards above and to the rear of the nose pads first named, and also adapted to grip the nose, substantially as specified. "(5) In an eyeglass, the combination, with lenses, of posts or standards secured thereto, pads for the nose rigidly secured to said posts or standards; certain of said pads being arranged in the same plane as the lenses, and other of said pads being arranged above the other pads, and to the rear thereof, substantially as specified."

The specifications are as follows:

"To all Whom it May Concern:
"Be it known that I, Walter S. Wells, of New York, in the county and state of New York, have invented a certain new and useful improvement in eyeglasses, of which the following is a specification: I will describe in detail an eyeglass embodying my improvement and then point out the novel features in claims. In the accompanying drawings, Figure 1 is a face view of an eyeglass embodying my improvement. Fig. 2 is a similar view illustrating a modification thereof. Fig. 3 is a side view of the example of my improvement shown in Fig. 1. Fig. 4 is a side view of the example shown in Fig. 2. Fig. 5 is a diagrammatic view showing the position of the eyeglass upon the nose and the arrangement of the pads, as illustrated in Figs. 2 and 4. Fig. 6 is a detail view showing the mode of attachment of certain of the nose pads for the glasses. Similar letters of reference designate corresponding parts. A designates the lenses of the eyeglasses, which may or may not be mounted in rims. B designates the spring by which the glasses are held upon the nose. C designates posts or standards secured to the lenses, as here shown, by rivets, c. In the example of my improvement shown in Figs. 1 and 3, D designates pads secured upon downwardly extending arms, d, which arms form part of or are secured to the posts or standards, C. The pads, D, in this example of my improvement, are in the same plane as the lenses of the glasses, and when in use bear against the cartilaginous portions of the nose. The posts or standards, C, have upwardly extending portions, to which portions the spring, B, of the glasses is attached. In the example of my improvement shown such attachment is effected by means of screws, b, passing through suitable apertures in the inwardly turned ends of the spring and in the upwardly extending portions of the posts or standards, C. I prefer that the posts or standards, C, and the downwardly extending portions, d, which bear the pads, D, shall be made integral. Secured to the upwardly extending portions of the posts or standards, C, are arms, d, which arms bear at their extremities pads, e. As shown in Fig. 6, these arms are adjustable upon the upwardly extending portions of the posts or standards, C, so that the pads may be brought nearer to or farther from each other, as desired. Such adjustment is secured by providing the portions of the arms, d, which are secured to the upwardly extending portions of the posts or standards, C, with longitudinally extending slots, f, as more clearly shown in Fig. 6. It will be observed that the pads, e, are considerably above the axes of the lenses, and that they have a backward and downward extension. This is more clearly illustrated in Figs. 3 and 4. In the example of my improvement shown in Figs. 2 and 4, and in the diagrammatic Fig. 5, I employ a modification of the nose pad or pads, D. This modification consists of two pads, D, which pads are mounted upon two arms, d, extending from the posts or standards, C. By reference to the diagrammatic view Fig. 5 and Fig. 4, it will be clearly seen that one of the pads, D, in this example of my improvement, is arranged in approximately the same plane as the lenses of the glasses, while the other is above and at the back of the said plane. It

will also be observed that the pads, D, in this example, together with the pads, e, are arranged approximately at the points of a triangle; or, in other words, the pads, D and e, have a triangular bearing upon the nose. In all the examples of my improvement shown, the pads, e, when secured by the screws, b, have a rigid connection with the upwardly extending portions of the posts or standards, C. By my improvement I provide an eyeglass which is adapted to grasp the fleshy portion of the nose by pads which are rigidly secured, and prevent any swiveling or rocking movement, and also other pads adapted to grasp the cartilaginous portion of the nose, and to act as steadiments."

The drawings are as follows:

It will be noted that these claims speak specifically of the combination with lenses of posts or standards secured thereto, "nose pads secured to said posts or standards and adapted to grip the nose, and other nose pads rigidly secured to said standards above and to the rear of the nose pads first named, and also adapted to grip the nose, substantially as specified." Claim 5 speaks of the combination with lenses of posts or standards secured thereto, pads for the nose rigidly secured to said posts or standards, certain of said pads being arranged in the same plane as the lenses, and others of said pads being arranged above the other pads and to the rear thereof,

substantially as specified. These claims, read with the specifications and drawings, clearly contemplate at least two pads attached to each post or standard secured to each lens, and adapted to grip the nose, and as clearly contemplates that one of such pads is to be above and to the rear of the first-mentioned nose pad, or, as mentioned in claim 5, one of said pads, at least, is in the same plane as the lens, and the other is above and to the rear thereof. In Figure 2 of the drawings we have two pads attached to each lens, with another pad for each lens above and to the rear thereof, adapted to grip the nose; while in Figure 1 of the drawings there would seem to be but one pad directly attached to and in the same plane with the lens, with another pad above and to the rear thereof.

Within the language of the claims, it would seem clear that any number of pads for each lens in the same plane as the lens, with other pads, one or more, above and to the rear thereof, would be allowable. There may be one or there may be more pads at each of the points specified. The claims call for such a combination and construction as has posts or standards attached to the eyeglass and secured thereto, with pads secured to these posts or standards, and which pads are adapted to grip the nose, with other pads secured to the same standards or posts above and to the rear of those first named. This court is unable to distinguish any particular difference between claims 4 and 5, except that in claim 5 the first set of pads is more definitely located as being in the same plane with the lenses. The pads in the drawings are secured upon downwardly extending arms, which may either form a part of or be secured to the posts or standards, which posts or standards extend upwardly from the point where they are attached or secured to the lenses by rivets, although this mode of attachment might be changed. These arms are adjustable upon the upwardly extending portion of the posts or standards, so that the pads may be brought nearer to or farther from each other, as may be desired by the wearer. This adjustment is secured by providing the arms with longitudinally extending slots. The pads above and to the rear of those in the same plane with the lenses are above the axes of the lenses, and have a backward and a downward extension.

It is evident that these pads are intended to grasp the nose at least at two different points, one of which points is in the rear of the other and higher up; the purpose being to prevent any swiveling or rocking movement of the glasses. The pads above and to the rear of those in the same plane with the lenses are the main ones, while those in the same plane with the lenses serve a useful purpose in steadying the glasses and preventing a rocking movement.

As shown in actual construction and use, this form is not bulky or cumbersome, but neat and tasteful in appearance, and the glasses, when adjusted upon the nose, are held steadily in position, and neither rock sidewise nor tip forward or backward. The utility of this construction cannot well be questioned.

It was shown on the trial that claims 4 and 5 of the Wells patent, from some points of view, are generic, and from other points specific. The defendants' expert says:

"Q. Do you regard the claims 4 and 5 of the Wells patent as generic or specific? A. The terms 'generic' and 'specific,' as I understand them, are both relative, so that from some points of view the claims might be regarded as generic, and from other points as specific. I regard them as generic to the extent that, as I understand, they may include various specific forms or arrangements so long as they are characterized by having two or more pads, with certain of said pads above and to the rear of the other."

The defendants, in their defense of anticipation, rely largely on a patent to Ivan Fox, issued January 29, 1884, No. 292,479. The specifications and claim in that patent are as follows:

"To all Whom it May Concern:

"Be it known that I, Ivan Fox, a citizen of the United States, residing in the city and county of Philadelphia, and state of Pennsylvania, have invented a new and useful improvement in eyeglasses, of which the following is a specification: My improvement relates to that class of eyeglasses having adjustable nose pieces that are arranged out of the plane of the lens frames; and it consists in such an arrangement and construction of the parts as will admit of the angle of the nose pieces and the distance apart of the centers of the lenses being permanently adjusted, as desired, in the manner hereinafter more fully described and claimed. In the accompanying drawings, Figure 1 represents a front view, Fig. 2 a side view, and Fig. 3 a detail, of one of the nose pieces. The bow, s, eye frames, and lenses, FF', may be made of any approved form, as my invention relates solely to the nose pieces, NN', the form of which is shown clearly in Fig. 3, where it will be seen that each nose piece consists of an inclined bar, a, having arm, b (preferably curved, as shown), by which the nose piece is attached with a screw, c, as shown in Fig. 1, to any convenient part of the frame, but preferably as shown in the drawing, in which it is screwed fast upon the top of the spring bow, and is held from moving by means of the sides of the recess in which the arm of the nose piece and bow are secured. The arm is made integral with the bar, a, and projecting from a point near the middle, relieves the torsional strain therefrom. Said arm also being curved, practically lengthens the bar, so that it can be more readily twisted or bent. The arm, b, being of considerable length, and of soft metal—that is to say, metal that will readily bend, as desired, and when so bent will retain its form—can be readily twisted, to slightly change the position or angle of the bar to suit the shape of the nose; or, by bending the said arms, b, the bars, aa, forming the nose pieces proper, can be readily brought closer together or farther apart, as desired, and thus the distance of the optical centers of the lenses can be varied as desired. I am aware that eyeglasses have been made with a curved arm projecting from the frame, and having attached thereto a nose piece; but I do not claim such as my invention. What I claim as new is: (1) The combination, with a pair of eyeglasses, of the nose pieces, NN', each consisting of the inclined bar, a, having the arm, b, integral therewith, and projecting from a point near its middle, substantially as and for the purpose specified. (2) The combination, with a pair of eyeglasses, of the nose pieces, NN', formed of comparatively soft metal, each having the inclined bar, a, and curved arm, b, integral therewith, and projecting from a point near its middle, substantially as and for the purpose specified."

In this Fox patent, 292,479, there is no lettering upon the drawings attached to correspond with either the specifications or the claims, and the court is left to guess at the construction, except that the bow is lettered, the lenses are lettered, and the nose pieces as a whole are lettered. It would seem, however, that the nose piece formed of soft metal consists of an inclined bar, which strikes the nose with the curved arm, b, projecting, and which attaches to the bow, s, where the bow is attached to the frame of the lens. The nose piece would seem to consist of a single piece of soft metal, curved, the arm projecting from near the middle thereof serving to attach

this to the bow holding the lens. This nose piece would strike the nose, it might be, at one point, and it might be at two or more points, depending on the shape of the nose; but the court discovers nothing in this corresponding to the construction of the complainant's patent except that we have lenses, a bow, and a nose piece attached to each lens, and by means of the bow these are pressed against the nose, and are supposed to hold the glasses in position. There is no anticipation here. We have nothing specially designed to prevent swiveling or a rocking movement of the glasses, or to prevent their tipping forward and downward, as in the complainant's patent. True, if the grip of the nose pieces are strong enough, the glasses might not rock or swing or tip. The construction of this Fox patent is much more simple, as shown in the drawings, but with this simplicity utility is sacrificed.

The lasso guards, which are alleged to infringe claims 4 and 5 of the Wells patent in suit, are manufactured and sold under patents to Ivan Fox, No. 695,681, dated March 18, 1902, and No. 34,752, dated July 9, 1901. The specifications and claims of this patent read as follows:

"Be it known that I, Ivan Fox, a citizen of the United States, residing at Lansdowne, in the county of Delaware and state of Pennsylvania, have invented certain new and useful improvements in nose pieces for spectacles or eyeglasses, of which the following is a specification: It is the object of my invention to provide, for employment upon eyeglasses and spectacles, nose pieces, capable of being fitted to noses of any configuration, of such construction and arrangement as to be secure and comfortable to the wearer. In the accompanying drawings I show, and herein I describe, a good form of a convenient embodiment of my invention, the particular subject-matter claimed as novel being hereinafter definitely specified. In the accompany drawings, Figure 1 is a view in rear elevation of a pair of eyeglasses equipped with nose pieces embodying my invention. Figure 2 is a view in end elevation of one of the lenses and nose pieces shown in Figure 1, sight being taken toward the inner end of the lens. Figure 3 is a plan view of a blank from which a complete nose piece may be formed. Similar letters of reference indicate corresponding parts. In the accompanying drawings, a are the lenses, b the clasps and lens posts, and c the bow spring, of a pair of eyeglasses. My improved nose pieces consist each of an approximately U-shaped loop of suitable metal, and are conveniently formed by bending up a flat strip of metal previously cut by a die or otherwise to the desired shape. The free leg, e, of each nose piece merges at its end into an enlargement, f, which extends edgewise rearwardly more or less according to adjustment, out of the plane of the lenses, is preferably of approximately oval form, and conveniently of breadth about twice that of the strip. Said enlargement and free leg, although in the fitting operation to be given such curvature as may be necessary to cause them to conform to the wearer's nose, are to be considered as existing in approximately a common plane; that is to say, as together constituting a plate or sheet of metal The enlargement, which constitutes a bearing plate, is provided with a large central aperture, g, shown as corresponding in outline with its own. Said aperture is conveniently of a breadth about equal to that of the strip of which the body of the U-shaped loop is formed. The nose pieces may be attached by screws or pivots passing through the upper ends of their basal legs, d, and into the lens posts, or other portions of the spectacle or eyeglass frame or mounting. When in position, the bight of the U-shaped loop depends below the screw, pivot, or other device employed to secure the nose piece in position. By reason of the rearward adjustment or set of the enlargement, f, it is out of line with the upper end of the basal leg; that is to say, is, when the device is in use upon a spectacle or eyeglass, nearer the plane of the eyes of the wearer than is the upper

end of the basal leg. When the nose pieces are mounted as stated, the free legs, e, may be lengthened or shortened to the better fit a wearer by such manipulation of the metal as will shift the position of the bight, h, relatively to the length of the strip. Said free leg as well as the basal leg may be set at any desired angle with relation to the plane of the lenses to fix and determine the position of the bearing plate, and said plate itself may be adjusted toward and from the plane of the lenses by manipulation of the neck, i, by which it is connected to the free leg. Apart from the movement or adjustment of said leg, and said plate as a whole, said plate may, as to its different parts, be adjusted or bent to a set other than that illustrated. In addition to adjustment toward and from the plane of the lenses, the different parts of the nose pieces may be adjusted toward and from the nose of the wearer, and the plates may be given, as shown in Fig. 1, a curvature in which their respective upper inner portions are, to the better conform to the wearer, further apart than their lower portions, while the lower portions of the loops may also be, as shown, bent bodily away from each other, or otherwise, to present the acting faces of the bearing plates in contact with such part of the nose of the wearer as may best secure the desired result. The openings in the bearing plates are of such area that in use the skin or fleshy parts of the nose of the wearer will project bodily slightly thereinto, whereby the hold of the nose pieces will be re-enforced, a result not possible where minute openings are resorted to. While I do not herein illustrate my nose piece as provided, as to the bearing plate and the free leg which act against the nose of the wearer, with the celluloid or other facings largely employed in connection with nose pieces, and in fact, with my present knowledge, prefer not to employ them, it is to be understood that I do not exclude the application of facings to the structure herein claimed, provided only that they be not so applied as to close the skin-receiving opening. Two factors must be taken into account in the fitting of the lenses; that is to say, the necessity for supporting the lenses in proper position with respect to the eyes, and the desirability of setting the nose pieces at such position upon the nose of the wearer that they will take a secure hold. As these two positions both vary in different individuals, and possess no fixed relation, it has been difficult to accomplish both desiderata with nose pieces as heretofore constructed. My improved nose pieces, however, possess such a range of adjustment that they may be bent to present against that part of the nose of the wearer where they take the most secure hold, while at the same time the lenses may be set at any desired position with respect to the eyes. The precise diameter of the skin-receiving apertures in the enlargements is a matter within the province of the constructor. I employ apertures of about the size, proportionately, to the other parts, illustrated in the drawings. The character of the skin is such that a minute opening is not adapted to receive and take a grasp upon it. The opening must be of considerable magnitude, else a mass of the skin will not enter it. It is to be understood, therefore, that in claiming skin-receiving apertures, I intend to cover openings bearing approximately the same relation, as to size, to the nose piece, as do the openings shown in the drawings bear to the nose piece therein depicted, and intend the words 'skin-receiving openings' to exclude openings materially smaller, proportionately, than the openings depicted.

"Having thus described my invention, I claim: (1) A nose piece for a spectacle or eyeglass, the same consisting of a U-shaped loop, formed from a strip of plate metal, one leg of which is adapted to be attached to a lens, lens frame, or mounting, and the other provided with an enlarged bearing plate arranged at its upper end, and forming a direct continuation of it, but out of line with the upper end of the first mentioned or basal leg, said bearing plate and its leg existing in approximately the same plane, so that in use both are in acting contact with the nose of the wearer, and said bearing plate embodying a large skin-receiving opening, substantially as set forth. (2) A nose piece for a spectacle or eyeglass, the same consisting of a U-shaped loop, formed from a strip of plate metal, one leg of which is adapted to be attached to a lens, lens frame, or mounting, and the other provided with an enlargement constituting a bearing plate arranged at its upper end, and forming a direct continuation of it, but set out edgewise from it; said bearing

plate and leg existing in approximately the same plane, so that in use both
are in acting contact with the nose of the wearer, and said bearing plate
embodying a large skin-receiving aperture cut directly through it, substan-
tially as set forth."

It will be noted, in connection with the complainant's patent, that
one object of the two or more pads attached to each post or standard
secured to each lens, and adapted to grip the nose, is to enable the
wearer of the glasses to adjust and support the lenses in proper posi-
tion with respect to the eyes, and to enable him to set the nose pieces
at such position upon the nose that they will take a secure hold.
These positions on the nose where the grasp of the nose pieces must
be had vary in different individuals, and possess no fixed relation.
The complainant's patent provided for these nose pieces in such a
way that they might be adjusted easily either by bending, or by
means of the slots, to any shaped nose in any individual. A careful
reading of the specifications of the Fox patent, No. 695,681, demon-
strates that Fox sought by means of his patent to accomplish the
same purpose.

Should we take the complainant's patent, and connect the nose
pieces by a soft metal or otherwise, leaving a small hole therein of
any shape through which the skin might protrude, we would have
substantially the same construction, ideas, and purposes accomplished
and sought to be accomplished by means of the Fox patent, No.
695,681. In this Fox patent of March 18, 1902, the specifications
say: "a are the lenses, b the clasps and lens posts, and c the bow
spring, of a pair of eyeglasses." Here we have posts, and it mat-
ters little whether the posts are perpendicular or horizontal. In this
Fox patent he says:

"My improved nose pieces consist each of an approximately U-shaped loop
of suitable metal, and are conveniently formed by bending up a flat strip of
metal previously cut by a die or otherwise to the desired shape."

He then says:

"The free leg of each nose piece merges at its end into an enlargement,
which extends edgewise rearwardly more or less according to adjustment,
out of the plane of the lenses, is preferably of approximately oval form, and
conveniently of breadth about twice that of the strip."

In place of the nose pads used in the complainant's patent, we
have this nose piece so arranged and cut as to act as pads and press
against the nose at the same points and in the same manner that
the pads of complainant's patent press against the nose, and thus
serving the same purpose in the same manner. In the Fox patent
of March 18, 1902, the lower portion of the U-shaped loop serves
the same purpose as the nose pads, D, D, in the complainant's pat-
ent, known as the Wells patent, while the upper portion of the U-
shaped loop serves the same purpose as the nose pads in the Wells
patent (complainant's patent) above and to the rear of the first-
mentioned nose pads. In the Wells patent (complainant's patent)
these lower nose pads are attached by mechanism at or very near
the same point where attachment is made to the lenses, and it is at
this point that the Fox patent attaches the U-shaped loop. In the

Wells patent we have an arm extending upward from this point, and connecting with the bow spring; and at this point, by means of a screw or otherwise, the other nose piece is attached—the one extending backward. In the Wells patent we have more machinery, so to speak, more mechanism, and which of the two, the Wells patent or the Fox patent, is most desirable and most useful, would depend largely upon the taste of the wearer. It must be conceded, however, that the Fox patent construction is much more readily kept in order, while it would seem plain that the nose pads in the Wells patent are much more easily and quickly adjusted to the nose of the wearer.

All the patents and devices in evidence and use prior to filing of the application for complainant's patent have been carefully examined. The complainant's patent is a new and a useful invention, and was not anticipated. No equivalent was in use prior to the filing of the application for this patent. It proved a business and a commercial success, and met with large sales. The defendants' device or lasso guards for eyeglasses, although, so far as the nose piece is concerned, formed of a single piece of metal, usually, is a substantial duplication of complainant's guards, and was intended to be, and embodies the same principle and ideas, and serves the same purposes. It has the complainant's posts, in a different form, true, but the pressure or holding upon the nose comes at the same points in the same manner substantially, and all of the U-shaped loop mentioned in defendants' patent, No. 695,681, dated March 18, 1902, is surplusage except the points of pressure upon the nose, which points may appropriately be called pads. It is immaterial on the question of infringement that the points of pressure serving as pads are connected by means of this superabundant material. In like manner the defendants' construction serves the same purpose in the same manner for preventing tipping, etc. The defendants have appropriated the complainant's invention by varying the form of construction and in minor details by varying the form and manner of attachment to the frames or lenses. These variations are immaterial so far as the principle of complainant's invention is concerned, and cannot relieve the defendants from the charge of infringement. The infringement is deftly hidden from the eye of a casual observer, but cannot be concealed from the user. The lasso guards are so constructed as to be adjusted by bending and producing the pad pressure at any desired point.

The defendants' device, the Fox patent, No. 695,681, dated March, 1892, displays great ingenuity in attempting to evade the charge of copying and infringing complainant's patent, No. 412,442, dated October 8, 1889, but this cannot avail. Hoyt v. Horne, 145 U. S. 302, 309, 12 Sup. Ct. 922, 36 L. Ed. 713. So in the specifications the Fox patent carefully avoids the use of the word "pad," and substitutes the "U-shaped loop of suitable metal"; but how can this be material when we find the "U-shaped loop" performing the same functions in the same manner, and embodying precisely the same ideas of accomplishing the desired end, as the complainant's "pads"?

In Hoyt v. Horne, 145 U. S. 302, 12 Sup. Ct. 922, 36 L. Ed. 713,

at page 309, 145 U. S., page 925, 12 Sup. Ct., 36 L. Ed. 713, the court said:

"Indeed, the ingenuity displayed in this evasion is only equaled by the ingenuity with which it is concealed in the specification of defendant's patent and the function of a more thorough mixture of the pulp put forward as the salient feature of the invention."

The salient features of the Fox patent referred to are the same as those of the Wells patent, and, indeed, in seeking to hold the market with a Fox patent we find him abandoning his old form and invention, No. 292,479, of January 29, 1884, and appropriating all the substantial features and ideas of the Wells patent.

In Machine Company v. Murphy, 97 U. S. 120, 24 L. Ed. 935, the court said:

"Except where form is of the essence of the invention, it has but little weight in the decision of such an issue; the correct rule being that in determining the question of infringement the court or jury, as the case may be, are not to judge about similarities or differences by the names of things, but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions, or in a different way, or produce a substantially different result. Nor is it safe to give much heed to the fact that the corresponding device in two machines organized to accomplish the same result is different in shape or form the one from the other, as it is necessary in every such investigation to look at the mode of operation, or the way the device works, and at the result, as well as at the means by which the result is attained. Inquiries of this kind are often attended with difficulty; but, if special attention is given to such portions of a given device as really does the work, so as not to give undue importance to other parts of the same which are only used as a convenient mode of constructing the entire device, the difficulty attending the investigation will be greatly diminished, if not entirely overcome. Cahoon v. Ring, 1 Cliff. 620 [Fed. Cas. No. 2,292]. Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that, if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape. Curtis, Patents (4th Ed.) § 310." Again: "One may not escape infringement by joinder of two elements into one integral part, if the united parts effect the same results in substantially the same way as the separate parts before the union."

Bundy Mfg. Co. v. Detroit Time Reg. Co., 94 Fed. 527, 36 C. C. A. 375.

This is what was done in the case at bar by the use of superabundant material to form a U-shaped loop in place of pads. These lasso guards were made by defendants and put upon the market prior to the commencement of this action. The conclusion is irresistible that complainant's patent is valid, and that defendants have infringed claims 4 and 5, and are infringing the same.

The complainant is entitled to an injunction and to an accounting. A decree will be prepared accordingly.